L.I. HEAD START CHILD DEVELOP-MENT SERVICES, INC., Anthony Macaluso and Paul Adams, Individually on their own behalf and on behalf of all other persons similarly situated, Plaintiffs,

v.

John L. KEARSE and Alphonso Anderson, as Trustees of the Community Action Agencies Insurance Group, and Community Actions Agencies Insurance Group, Defendant.

No. CV 93–1443(ADS).

United States District Court, E.D. New York.

March 3, 2000.

Altieri, Kushner, Miuccio & Frind, P.C. by Alexander A. Miuccio, Barry L. Mendelson, New York City, for Plaintiffs.

Frank & Breslow, L.L.P, Farmingdale by Allen B. Breslow, Ralph A. Somma, Farmingdale, NY, for Defendants.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The fiduciary duty of loyalty imposed by ERISA is designed to ensure that fund assets are held and administered for the sole and exclusive benefit of plan participants.

*O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc.,* 37 F.3d 55, 61 (2d Cir.1994) (citing *Levy v. Local Union Number 810,* 20 F.3d 516, 519 [2d Cir.1994]).

### I. BACKGROUND

On April 1, 1993, this action was commenced by the plaintiffs L.I. Head Start Child Development Services, Inc. ("Head Start") and two class representatives, pursuant to the Employee Retirement Income Security Act ("ERISA"), 20 U.S.C. § 1000, *et seq.* The action was brought against individual trustees of the Community Action Agencies Insurance Group and the Community Action Agencies Insurance Group Fund (the "CAAIG Trust"), a health and welfare benefit fund in which the plaintiffs participated between the years of 1986 and 1992. Head Start is a not-for-profit corporation that operates a Head Start program under a direct guarantee of funds from the federal government. The program provides early childhood education to children from disadvantaged backgrounds.

On September 1, 1992, Head Start withdrew from the CAAIG Trust and formed a new health and welfare benefit fund. It is alleged by the plaintiffs that the CAAIG trustees were under a fiduciary duty imposed by ERISA, 29 U.S.C. §§ 1103, 1104, to hold the shares of the CAAIG Trust assets attributable to contributions made by Head Start employees for the exclusive purpose of providing benefits to those em-

ployees. The complaint further alleges that the defendant CAAIG trustees violated their fiduciary duties by refusing to transfer or return Head Start's past contributions so that they could augment Head Start's newly formed health and welfare benefit fund. The plaintiffs complaint seeks to compel the defendants to account for reserves in the CAAIG Trust that represent contributions made by Head Start on behalf of the plaintiff employees and to transfer those assets to the newly formed fund.

The plaintiff's complaint sets forth five separate causes of action. The first claim alleges that the CAAIG trustees violated the "exclusive benefits" rule of ERISA § 1104(a)(1)(A) by refusing to transfer Head Start's share of CAAIG's reserves held for the exclusive purpose of providing benefits to its participating employees. The second cause of action seeks an accounting by the trustees to ascertain the share of the CAAIG reserves attributable to Head Start's past contributions. The third claim alleges that by failing to return the portion of reserves attributable to Head Start's past contributions, the CAAIG Trust has been unjustly enriched and received a windfall to the extent of such share of reserves wrongfully retained. The fourth claim asserts that the trustees breached their fiduciary duties to the plaintiff class members under the "exclusive benefit" rule of ERISA § 1104(a) by refusing to act upon the demands of Head Start for the transfer of the reserves reflecting past contributions made to CAAIG on behalf of its employees. The fifth cause of action alleges that the trustees violated their fiduciary duties under ERISA § 1103 by failing to hold the portion of reserves attributable to past contributions made by Head Start for the exclusive purpose of providing benefits to Head Start's participating employees and their beneficiaries.

Based on these allegations, the plaintiffs seek an order directing the defendant trustees to transfer Head Start's portion of the reserves to a trust fund to be held for the exclusive benefit of Head Start's employees and their beneficiaries.

A non-jury trial was held on January 26, 27 and 28, February 12 and 19, April 9 and 30, and September 17, 1999.

## II. THE TRIAL—FINDINGS OF FACT

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) *See Rosen v. Siegel*, 106 F.3d 28, 32 (2d Cir. 1997); *Colonial Exchange Ltd. Partnership v. Continental Casualty Co.*, 923 F.2d 257 (2d Cir.1991). During this portion of the opinion, the Court will make findings of fact which will be supplemented by additional findings later in the opinion. Most of the facts are not controverted and were set forth in the proposed findings of facts submitted by the respective parties upon the conclusion of the trial.

### A. *The Uncontested Facts*

The plaintiff, Head Start is a not-for profit corporation organized and existing under the laws of the State of New York. Defendant CAAIG is an employee welfare benefit plan within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1). The CAAIG Trust was established for the sole and exclusive purpose of providing health and welfare benefits to employee participants and their beneficiaries within the meaning of ERISA §§ 1103(c)(1) and 1104(a)(1)(A), 29 U.S.C. §§ 1103(c)(1) and 1103(a)(1)(A). The CAAIG Trust was formerly known as the Community Action Agencies Trust Fund II.

The CAAIG Trust was established by a written trust agreement dated October 4, 1983. The fund was to provide health, medical, dental and other benefits for the employees of the Economic Opportunity Commission of Nassau County, Inc. ("Nassau EOC"), the Economic Opportunity Council of Suffolk, Inc. ("Suffolk EOC") and any other employer who became a participating employer. The agreement

was signed by John Kearse, the chief executive officer of the Nassau EOC, and Lorenzo Merritt, the Director of the Suffolk EOC, on behalf of those organizations. Both Kearse and Merritt also signed as Trustees under the terms of the agreement.

Prior to November 30, 1985, the employees of Head Start were employed by Suffolk EOC and were covered under the CAAIG as such employees. On November 30, 1985 Head Start became a separate participating employer in the CAAIG Trust. From that time, the former employees of Suffolk EOC hired by Head Start were covered under the CAAIG Trust as participating employees of Head Start without any break in coverage. At the time that Head Start became a participating employer in the CAAIG Trust, Nassau EOC, Suffolk EOC and Yonkers Community Action Program, Inc. also were participating employers in the CAAIG Trust.

Pursuant to the terms of the October 4, 1983 Trust Agreement, the participating employers, including Head Start, were required to and did make payments to the CAAIG Trust on behalf of their covered employees. The monetary payments made by the participating employers were used to provide health and insurance benefits to the participating employees and to pay the administrative expenses of the CAAIG Trust. They did this by purchasing health coverage from private insurance carriers. On September 1, 1986, the CAAIG Trust began providing health, dental and hospitalization benefits on a self-insured basis while continuing to purchase life insurance and disability insurance from insurance carriers. The Nassau EOC Board of Directors approved participation in the self-insured benefits plan at its Board Meeting on September 25, 1986. The Yonkers Community Action Program, Inc. approved participation in the self-insured benefits plan at its September, 1986 Board

of Directors Meeting. The Suffolk EOC Board of Directors also approved participation in the self-insured benefit plan at its Regular Board of Directors Meeting on November 20, 1986.

From November 30, 1985 through August 31, 1992, Head Start made payments to the CAAIG Trust on behalf of all its covered employees, including all of the members of this class action. During the entire period Head Start was a contributing employer, the CAAIG Trust accumulated reserves. As of August 31, 1992, the financial statements of the CAAIG Trust indicated that the total amount of the reserves for all contributors was $1,117,-507.00. The portion of reserves attributable to Head Start's past contributions made on behalf of its employees, including interest, was $499,736 (Pl.Ex. 70).[1]

On July 29, 1992, Head Start notified the CAAIG Trust that it was discontinuing its participation in the Fund as of September 1, 1992. In that notification, it requested the return of that portion of the remaining reserves attributable to past contributions made by Head Start on behalf of its participating employees. The letter stated:

> please be informed that effective September 1, 1992, L.I. Head Start Child Development Services Inc., shall discontinue its participation in CAAIG's Health, Life AD & D, LTD. and DBL plans. We would appreciate the immediate return of our Health Insurance reserve funds held in escrow by CAAIG so that we may make the appropriate distribution.

(Pl.Ex. 46). On September 1, 1992, Head Start terminated its participation in the CAAIG Trust. On September 24, 1992, Head Start again requested the return of that portion of the assets attributable to its past contributions on behalf of its employees. The letter stated:

---

1. Pl.Ex. refers to an exhibit introduced into evidence at the trial by the plaintiff. Similar-

ly, Def. Ex. refers to an exhibit introduced into evidence at trial by the defendant.

By our letter dated July 29, 1992, Mrs. Phyllis Simmons informed you that effective September 1, 1992, L.I. Head Start Child Development Services, Inc., would discontinue its participation in CAAIG's Health, Life, AD & D, LTD and DBL plans. She also asked for the immediate return of our health insurance reserve funds. To date, we have not received a response to our request. Please contact us as soon as possible. We would like to avoid turning this matter over to out attorney.

(Pl.Ex. 47). The defendants refused to transfer, relinquish or return any portion of the CAAIG Trust assets allocable to past contributions by Head Start.

Defendants John L. Kearse and Alphonso Anderson were trustees of the CAAIG Trust at the time the demands were made by Head Start for the transfer of the reserves and at the time this action was commenced. By Order dated October 26, 1994, this Court certified this action as a class action. The certified class consists of Head Start employees who were also past participants in the CAAIG Trust. By Order dated October 26, 1994, this Court approved the plaintiffs Anthony Macaluso and Paul Adams as representatives of the class.

### B. *The Contested Facts*

The parties essentially disagree as to three material facts. The first material fact at issue is whether the CAAIG assets were held in a single pooled account in the name of CAAIG without segregating the contributions from the various employers. The second material fact requires a determination as to the validity of a modified Trust Agreement purportedly signed by Kearse and Meritt on October 6, 1983, which prohibits the transfer of reserves to any employer who withdraws from CAAIG. The third material fact, which is actually a mixed question of law and fact, concerns the validity of an alleged amendment to the original Trust Agreement, dated August 7, 1986, which prohibits the transfer of reserves to any employer who withdraws from CAAIG.

### 1. Were the Funds Segregated or Pooled ?

The defendants claim that the CAAIG assets were held in a single pooled account in the name of CAAIG without segregating payments from various participating organizations. In other words, the defendants argue that the funds were pooled and not separately ear-marked.

The Court finds that the credible evidence presented at the trial demonstrates that the CAAIG was not a pooled fund and that each of the contributing employer's funds were segregated. The annual financial reports of CAAIG indicate that the funds were segregated. In addition, the financial reports reveal the direct allocation of benefits paid and the proportionate administrative expenses from each segregated portion of the fund. (Pl.Exhs.29–38).

The plaintiffs first witness at the trial was Michael Monteforte, Jr., the accountant for the CAAIG Trust from 1985 to 1992. Monteforte testified, in pertinent part, that:

Q: And you broke down under each agency, you allocated to each agency the gross billings, the premiums incurred, the professional fees, the bank charges and the interest to arrive at the reserves at the end of the fiscal year for each agency is that correct ?

A: Correct.

(Tr. at 48).[2]

A: I take the information CAAIG gives me regarding the gross bills, the—billings, the cash receipts, disbursements, whether buying insurance or paying claims or other administrative expenses. And based on the information they give me, it is generally broken down by each of the individual participating agencies.

2. Tr. indicates the trial transcript.

Those items which are not directly given to me for each agency as in the case with expenses in some cases and the interest earned, they are allocated.

Q: You would determine the amount— you would calculate the amount at the end of the fiscal year, and after deducting the billings information they gave you and the expense information they give you, you would arrive at the reserve at the end of the year allocated to each company ?

A: Correct.

(Tr. at 62). In addition, the Schedule of Reserves contained in the annual financial reports indicate that each of the contributing employer's contributions were segregated according to each employer and CAAIG's income and expenses were allocated to each employer. (Pl.Exhs.27–42). Furthermore, the testimony of Kearse, one of the trustees of CAAIG and its administrator, acknowledged in his deposition which was read into the record at trial, that if CAAIG was terminated, each of the contributing employers would receive its share of the remaining reserves. Kearse stated:

> [s]o that for my purposes, and the reason why this chart is included in the report, it was important to me to know and understand, I thought, how each individual participant agency was performing and what the claims experiences were; that premiums were paid and if I had in 1988 to dissolve this plan I needed to have some notion after we had met all of our obligations as to what, if any, part or portion of any excess, what may have proven to have been excess reserves, would have been available and I would have had, as was original (sic) thought, have been able to provide those back to the individual entities . . . .

(Tr. at 948).

Based on the documentary evidence and the testimony adduced at the trial, the Court finds that CAAIG segregated the contributions of each of the participating employers and directly allocated the bene-

fits paid and the proportionate CAAIG administrative expenses to each of the contributing employers.

## 2. As to the Validity of the October 6, 1983 Agreement

The defendants contend that the terms of the Trust Agreement dated October 4, 1983 were superseded, modified and amended by a Second Trust Agreement that was executed by Kearse and Meritt on October 6, 1983. (Def.Ex. B). While the October 3, 1983 Agreement was silent as to the transfer of reserve funds, the October 6, 1983 Amendment stated that "[v]oluntary withdrawal or termination of any of the member CAA, shall result in forfeiture of any and all monetary participation in the accumulated funds in the Trust Fund." *Id.* The defendants contend that the document was executed at the offices of the Nassau EOC as authorized at a joint meeting of Nassau and Suffolk EOC Executive Committees on October 4, 1983 at the Suffolk EOC office. Also, the defendants submit that the signatories signed the document on behalf of their respective Community Action Agencies for the benefit of their employees. As stated above, the October 6, 1983 agreement prohibits the transfer of reserves to any employer who withdraws from CAAIG.

The Court finds that the October 6, 1983 "agreement" has no effect on the rights of the parties as there is no credible evidence that the document was executed at any time relevant to the disposition of this action. The Court does not credit the testimony of Kearse and Charlotte Singer, the notary public, with regard to the execution of this "agreement." Kearse testified that all of the signatures, including that of the notary public, were placed on the document on October 6, 1983.

Q: Mr. Kearse, when was this document prepared ?

\* \* \* \* \* \*

A: This document was prepared, typed on—it is dated October 6th. I don't

know whether it was prepared October 6th or 5th.

Q: Who was present when that document was signed ?

A: This document is signed by me and Mr. Lorenzo Merritt who represented the Suffolk program.

Q: Was anybody else present at the time you signed the document ?

A: At the time of the signing of the document present was Ms. Charlotte Singer. Ms. Singer in fact notarized he signing of the document.

Q: When did she notarize the signing of the document?

A: Same date. We signed it in front of her.

(Tr. at 167–168). Charlotte Singer, the notary public, testified that the document was signed by Kearse and Merritt in her presence and at the same time, on October 6, 1983, she notarized their signatures:

Q: You've seen that document before ?

A: Yes, sir.

Q: I direct your attention to the last page. Is that your signature ?

A: Yes, that's my signature.

Q: Were you present when that document was signed by Mr. Kearse and Mr. Merritt?

A: Yes, I was.

Q: Did you witness signing that document ?

A: Yes, sir, I was.

Q: Did you affix your notary signature to that page ?

A: Yes.

Q: Did you affix it set forth therein ?

A: Yes.

Q: Did you see them sign it on that date ?

A: Yes, I did.

(Tr. at 371–372).

Curiously, when Singer was deposed on March 10, 1997, almost two years prior to the trial and closer in time to the events at issue, her memory of these circumstances was not very clear.

Q: Ms. Singer, do you recall being deposed by me in this courthouse on March 10, 1997 ?

A: Yes.

\* \* \* \* \* \*

"Question: Did you follow your custom at the time that you acted as a Notary Public with respect to Plaintiff's Exhibit 138 in notarizing the signatures on the last page ?"

\* \* \* \* \* \*

"Answer: I believe I did."

"Question: When you say 'you believe that you did,' do you actually remember the circumstances surrounding the execution of this agreement ?"

"Answer: No."

\* \* \* \* \* \*

"Answer: I don't remember the circumstances of this particular document, but my custom was I either signed it at my desk which is right outside Mr. Kearse's door or he called me in his office. That was the procedure. I never signed or would have taken it away from there. It would have been just in that area, that vicinity, either place."

"Question: You already testified as to what your custom is. What I am trying to find out from you, Ms. Singer, if you actually remember where the act of notarization took place when you notarized this document, the signatures on this document marked Plaintiff's Exhibit 138 ?"

"Answer: No, I do not."

\* \* \* \* \* \*

"Question: Listen to the question. You initially said you don't remember the circumstances. You don't remember if you notarized their signature. Now I am asking a further question. Do you remember if the individuals who signed

this document appeared before you when you notarized the document?"

\* \* \* \* \* \*

"Answer: I don't remember the document."

"Question: Do you remember if any individuals appeared before you when you notarized this document?"

"Answer: The answer would have to be no."

(Tr. at 372, 374–378).

The testimony of Kearse and Singer with regard to the signing of the purported amendment is highly questionable. Further evidence putting the validity of the purported amendment in doubt was furnished by the plaintiff's expert witness, Robert L. Kuranz, who analyzed the ink used by Singer to notarize the purported October 6, 1983 document, and concluded that the type of ink used was not manufactured prior to January 1, 1984. Kuranz is a forensic ink analyst who was employed as a research ink chemist, product engineer and quality control manager in the ink writing instrument industry from 1956 to 1993. Kuranz testified that he was able to determine that the ink used on the purported October 6, 1983 document was manufactured by a company called Formulab's Inc. He further testified that the ink used by Singer to sign her name on the purported October 6th document contained "tags" used only in inks manufactured by Formulab in 1984. Kuranz concluded that Singer could not have signed her name to the original document on October 6, 1983. (Tr. at 263). The Court finds that Kuranz's testimony was believable and was unrefuted.

In view of the equivocal testimony of Notary Public Singer and the uncontradicted expert testimony by Kuranz, the testimony by Kearse and Singer that the document was signed and notarized on October 6, 1983 is not credible. In addition, the Court notes that Kearse's testimony is further undermined by the fact that the purported October 6, 1983 document was allegedly not located until 1996, three years after this action was commenced. (Tr. at 203–205). Kearse's explanation was unconvincing.

Q: Mr. Kearse, when this suit was instituted on April 1, 1983, I asked as part of plaintiff's discovery and inspection, all trust agreements and amendments thereto that would relate to the CAAIG plan. CAAIG produced for my inspection, the October 4, 1983 agreement .... You referred to you testimony yesterday about an October 6, 1983 agreement. Could you tell us what in you affidavit you referred to the October 4th agreement rather that the October 6th agreement?

\* \* \* \* \* \*

A: We were forced to continuously inspect and/or review whatever it was that we could lay our hands on in terms of files or records, to be responsive to your request as possible. [ ] I went into the hospital, and I was away from my work for [an] excess of four months .... But I knew coming back I had to look forward to a continuation of this process. [ ] I wanted to know whether or not we were still financially sound, and whether I was being responsible as a manager and administrator, in terms of that particular program. [ ][W]e were consistently directed to produce the files of CAAIG. And that's what we were diligently applying ourselves to. I now injected into the scenario a name that is connected, but never have we thought to look in those files of Mass Mutual, Mass Mutual Insurance. Lo and behold, we go to that file and in that file, the beginning where we started from, in a manila folder is the agreement dated October 6th of '83. And that is how that infamous agreement came on to the scene ....

(Tr. at 468–471).

Moreover, Kearse was unable to explain why a further amendment was required on August 7, 1986 prohibiting the transfer of the reserve funds, if the October 6, 1983

amendment was already in force. In addition, Kearse submitted an affidavit in which he identified the Trust Agreement dated October 4, 1983 as the "Trust Agreement." (Ex. 58). Finally, Kearse admitted that the Trust Agreement dated October 4, 1983 was the document that was distributed to the participating employer agencies. (Tr. at 220, 502). Accordingly, the Court finds that the purported October 6, 1983 document is not authentic and cannot be considered by the Court.

### 3. Was the August 7, 1986 Amendment Properly Ratified?

The final issue of fact to be resolved centers on the implications, if any, of the purported August 7, 1986 amendment to the trust agreement. The amendment states that "... [T]he Trustees amend the above named Trust Agreement by adding [the following language]. In no event may any unit ... withdraw any accumulated portion of the reserve fund, whether or not that unit's participation in the Trust is to be continued. Such reserve funds are to remain in the Trust, to be used or distributed in accordance with the provisions and purposes of this Trust ...." (Def.Ex. C).

The Court finds that the August 7, 1986 amendment was never formally adopted and is not a valid and binding agreement. The October 4, 1983 Trust Agreement sets forth the following procedure for amending the Agreement: "The Corporation reserves the right to amend the Trust Agreement at any time by action of its Board of Directors." Based on the evidence adduced at the trial, the Court finds that the amendment was never formally adopted "by action of its Board of Directors." As previously stated, the "Amendment" states that "the Trustees amend the above named Trust Agreement." The signature line of the "Amendment" indicates that Kearse and Judith Wilson signed the document as Trustees. No evidence was offered to establish that the Board of Directors of the CAAIG Trust, which included the four contributing employers, adopted or approved of the "Amendment." Thus, the Court finds that the Board of Directors did not sign, approve or ratify this Amendment.

As the "Amendment" was never signed, adopted or ratified by the Board of Directors, which was required by the terms of the October 4, 1983 Trust Agreement, the Court finds that the August 7, 1986 Amendment was not properly adopted and is not valid. Accordingly, based on the findings set forth above, the Court finds that the October 4, 1983 Trust Agreement is controlling. This agreement does not contain any provision prohibiting the return of the reserves to the departed contributing employer.

## III. DISCUSSION AND CONCLUSIONS

### A. The "Exclusive Benefits" Rule of ERISA

While typically, an individual is unable to recoup her premiums paid to a health insurance company if she decides to change insurers, in this case, Head Start made contributions on behalf of its employees into a Trust that was governed by the provisions of ERISA.

The applicable statute, 29 U.S.C. § 1103(c)(1) states, in pertinent part, that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." In addition, 29 U.S.C. § 1104(a)(1)(A) states, in pertinent part, that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan. As previously noted in the opening statement of this opinion, [t]he fiduciary duty of loyalty imposed by ERISA is designed to ensure that fund

assets are held and administered for the sole and exclusive benefit of plan participants." *O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc.,* 37 F.3d 55, 61 (2d Cir.1994) (citing *Levy v. Local Union Number 810,* 20 F.3d 516, 519 [2d Cir.1994] ).

As the Court has previously determined that the CAAIG was not a pooled fund, the plain meaning of ERISA requires the transfer of the portion of surplus reserves attributable to past contributions made by Head Start on behalf of its employees to a new health and welfare trust fund for the benefit of its employees. Any other conclusion would undermine the fiduciary duty that the Trustees owe to the employees of each contributing employer. As the Second Circuit stated in *The John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan,* 26 F.3d 360, 367 (2d Cir. 1994):

> Where fiduciary duties arise under ERISA, they must be enforced without compromise to ensure that fiduciaries exercise their discretion to serve all participants in the plan. *See Williams v. Williamson–Dickie Mfg. Co.,* 778 F.Supp. 1197, 1198–99 (S.D.Ala.1991). As Judge Friendly aptly stated in *Donovan v. Bierwirth,* 680 F.2d 263 (2d Cir.), cert. denied, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982), § 404 of ERISA requires that the decisions of a fiduciary "must be made with an eye single to the interests of the participants and beneficiaries." Id. at 271.

26 F.3d at 367. (other citations omitted). If the surplus reserves at issue were held by CAAIG for the benefit of non-Head Start employees, the plain language requirements of ERISA Sections 1103(c)(1) and 1104(a)(1)(A) that the plan be administered "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of providing benefits to participants and their beneficiaries," would be violated. It is well-settled that Courts should interpret a statute to give effect to the plain meaning of the statutory language. *See Patterson v. Shumate,* 504 U.S. 753, 757, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). Indeed, "[a]bsent a clearly expressed legislative intention to the contrary, the language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n. v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980).

The plain meaning of the applicable ERISA sections is that an employer's contributions must be used for the benefit of its own employees. An employer's contributions may not be used for the benefit of employees of other contributing employers. As a result, the provisions of ERISA require that the reserve funds be returned to Head Start to be used for the benefit of their employees. Any other result would create a windfall for the non-Head Start employees who would be using the funds contributed by Head Start and would violate the Trustees' fiduciary duty. *See Demisay v. Local 144 Nursing Home Pension Fund,* 935 F.2d 528 (2d Cir.1991), *rev'd on other grounds,* 508 U.S. 581, 113 S.Ct. 2252, 124 L.Ed.2d 522 (1993) (recognizing that when all the employees of an employer are removed from a fund, there is no chance that any of those employees will benefit from the past contributions made on their behalf unless there is a reallocation of reserves).

In addition to the plain meaning of Sections 1103(c)(1) and 1104(a)(1)(A), the Court is of the view that the Second Circuit decision in *Trapani v. Consolidated Edison Employees' Mutual Aid Society, Inc.,* 891 F.2d 48 (2d Cir.1989), mandates the return of Head Start's share of the reserves. In *Trapani,* a class action was brought on behalf of union members seeking the transfer of the aliquot shares of Mutual Aid's assets attributable to payments made by their employer on their behalf. The employees withdrew from Mutual Aid's fund and became participants in a different fund. Relying on the provisions of Section 1103(c)(1), the Second Cir-

cuit held that Mutual Aid violated ERISA by refusing to transfer the aliquot share of its benefit assets attributable to contributions made on behalf of the class members. In so holding, the Second Circuit reviewed two of its prior decisions:

> Mutual Aid contends that the above quoted language does not proscribe Mutual Aid's continued retention of the $114,778.35, citing O'Hare v. General Marine Transport Corp., 740 F.2d 160 (2d Cir.1984), cert. denied, 469 U.S. 1212, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985), as authority for its position. In that case a small number of employees of a single employer, who participated in a multi-employer pension fund, left the union and joined another union with its own pension fund. This court held that the monies contributed by the employer on behalf of these employees should not be returned to the employees or to the new fund. 740 F.2d at 173–74.

> The court distinguished the case of Local 50, Bakery and Confectionery Workers Union v. Local 3, Bakery and Confectionery Workers Union, 733 F.2d 229 (2d Cir.1984), in which it was held that an employer's contributions to one union's health benefits fund should be transferred to a successor health benefits fund when all of the employees of the employer chose a new bargaining unit.

> The facts in this case are akin to those found in Local 50, and come within the distinguishing factors set forth in O'Hare. These factors were that all of the employees of a single employer changed their bargaining representative in Local 50, while in O'Hare, only a small portion of the employees of a single employer made such change. Local 50 was concerned with a health benefits plan, while O'Hare dealt with a pension plan. The latter has different actuarial projections than health benefit plans, including the assumption that a certain percentage of the members will never receive benefits. We further noted that

> equitable considerations supported our conclusion in Local 50, since those workers who retained Local 50 as their bargaining representative would be unjustly enriched were the funds not transferred. Finally, we stated in Local 50 that the successor fund was entitled to the aliquot share of the assets, for otherwise, the assets "would have inured solely to the benefit of the remaining participants in the Local 50 fund, and Entenmann's workers would have derived no benefit from that portion of their past contributions." Local 50, 733 F.2d at 231.

> In this case there are stronger equitable considerations in favor of plaintiffs than in Local 50, since here the fund includes both employee and employer contributions. In addition, the change of funds in this case was initiated by Con Edison rather than by the employees. The decision in Local 50 controls our resolution here that Mutual Aid is not permitted to retain the funds in question.

Id. at 50.

The decisions in Local 50 and Trapani are analogous to the facts presently before the Court as they involve holdings where the Second Circuit found that ERISA mandated the transfer of assets to a new health plan so that the former participants of the old plan could receive future benefits under the new plan. The decisions in Local 50 and Trapani involved similar factual scenarios as is presently before the Court. As such, based upon those decisions, the Court concludes that Sections 1103(c)(1) and 1104(a)(1)(A) mandate that the portion of CAAIG's reserves that are attributable to Head Start's past contributions be transferred to a trust for the benefit of its employees.

The defendants attempt to distinguish Trapani on the basis that the funds involved in Trapani were from both the employer and the employees and that the funds were contributed pursuant to a collective bargaining agreement, is without merit. While the Court acknowledges that Head Start employees did not make contri-

butions to the CAAIG Trust and that the contributions made were not pursuant to a collective bargaining agreement, nothing in the *Trapani* opinion suggests that the these underlying facts were dispositive. Similarly, the defendants' reliance on *Ganton Technologies, Inc. v. National Industrial Group Pension Plan,* 76 F.3d 462 (2d Cir.1996) to support the position that the surplus reserves are non-transferable, is misplaced. The *Ganton* case involved a pension plan, not a health benefit plan, a distinction noted by the Second Circuit in *Trapani.* As stated above, the Court in *Trapani* recognized that *"Local 50* was concerned with a health benefits plan, while *O'Hare* dealt with a pension plan. The latter has different actuarial projections than health benefit plans, including the assumption that a certain percentage of the members will never receive benefits." *Trapani,* 891 F.2d at 50.

In addition, in *Ganton,* the Second Circuit pointed out that the trustees relied on the advice of actuaries that a transfer of assets would threaten the financial well being of the pension fund, to the detriment of the remaining employees. Unlike the situation in *Ganton,* this case is concerned with a health benefits plan. In addition, the record does not demonstrate that a transfer of $497,736, representing the Head Start reserve funds, would threaten the financial well being of the CAAIG Trust. It should be noted that while the defendants' post trial memorandum of law states that a report by Sedgewick Noble Lowndes on May 13, 1998 indicates that an award to the plaintiff would bankrupt the CAAIG Trust (defendants' post trial memorandum of law at 5–6), the Court sustained the plaintiffs objection as to the admissibility of the report, after which counsel for the defendants' withdrew the exhibit. (Tr. at 283–284). As such, the record is silent as to the ramifications that would result if judgment were rendered in favor of the plaintiffs.

While the Court recognizes that a judgment in the sum of $497,736 will undoubt-edly have a negative effect on the CAAIG Trust and the remaining three employer agencies, there is no compelling evidence presently in the record that demonstrates that a judgment in favor of the plaintiffs would seriously threaten the financial well being of the Trust. To the contrary, as of August 31, 1992, the total reserves remaining in the Fund was $1,117,507. In addition, the financial history of CAAIG from the time Head Start entered the plan to the time of its withdrawal indicates that the plan was never in danger of becoming underfunded. (Exhs.29–38). Finally, and as previously stated, to permit the remaining employer agencies still in CAAIG to use the contributions made by Head Start, would violate the purpose and plain meaning of ERISA that an employer's contributions must be used for the benefit of its employees. As such, the Court finds the defendants' reliance on *Ganton* to be unavailing.

The defendants' remaining arguments, including the claim that the plaintiffs lack standing under ERISA, are without merit. The Court adheres to its previous Orders of October 14, 1994 and September 11, 1995 and declines to address the issue for a third time. In addition, as the plaintiffs' complaint does not request prejudgment interest and because the $497,736 figure consists of $156,916 in interest earned by CAAIG allocable to Head Start (Ex. 70), the Court will not address that issue.

## IV. CONCLUSION

The provisions of the applicable ERISA statute, 29 U.S.C. §§ 1103(c)(1) and 1104(a)(1)(A) require the defendants to return to Head Start the sum of $497,736, the portion of surplus reserves segregated for and attributable to them.

Accordingly, it is hereby

**ORDERED,** that the defendants are directed to transfer the sum of $497,736 to a trust fund for the benefit of the class plaintiffs; and it is further

**ORDERED**, that the transfer of funds is to be completed within 60 days from the date of this order; and it is further

**ORDERED**, that any request for attorneys' fees and costs be served on the Court by counsel for the plaintiffs by April 3, 2000. Opposition to the request must be served by April 21, 2000, and a reply by May 5, 2000.

**SO ORDERED.**