DALLAS SCHOOL DISTRICT, as Fiduciary and Trustee of Its Employees Who are Members of the Class, Frank Galicki, On His Own Behalf and On Behalf Of All Other Persons Similarly Situated Within The Dallas School District, Pittston Area School District, as Fiduciary and Trustee Of Its Employees Who Are Members of the Class, George Cosgrove, On His Own Behalf Of All Other Persons Similarly Situated Within The Pittston Area School District

v.

NORTHEAST PENNSYLVANIA SCHOOL DISTRICTS (HEALTH) TRUST, Appellant.

Dallas School District, as Fiduciary and Trustee of Its Employees Who Are Members of the Class, Frank Galicki, On His Own Behalf and On Behalf Of All Other Persons Similarly Situated Within The Dallas School District,

Pittston Area School District, as Fiduciary and Trustee Of Its Employees Who Are Members of the Class, George Cosgrove, On His Own Behalf and On Behalf Of All Other Persons Similarly Situated Within The Pittston Area School District, Appellants

v.

Northeast Pennsylvania School District (Health) Trust.

Commonwealth Court of Pennsylvania.

Argued Dec. 12, 2012.

Decided April 17, 2013.

Howard J. Bashman, Willow Grove, for Appellant/Cross–Appellee Northeast Pennsylvania School Districts (Health) Trust.

Howard M. Levinson, Wilkes–Barre, for Appellees/Cross–Appellants Dallas School District, Pittston Area School District, Frank Galicki and George Cosgrove.

BEFORE: PELLEGRINI, President Judge, and LEADBETTER, Judge, SIMPSON, Judge, LEAVITT, Judge, and BROBSON, Judge.

OPINION BY Judge BROBSON.

This matter comes before us on appeal from a final judgment entered by the Court of Common Pleas of Luzerne County (trial court) in a civil action against Appellant/Cross–Appellee Northeast Pennsylvania School Districts (Health) Trust (Trust).[1] Appellees/Cross–Appellants Dallas School District and Pittston Area School District (School Districts), among others, brought the civil action to compel an accounting and a disgorgement of funds from the Trust to be deposited into new trusts for the sole and exclusive benefit of the School Districts' employees and their beneficiaries/dependents. (Amended Complaint, Reproduced Record (R.R.) 10a–136a.) By way of counterclaims, the Trust asserted that the School Districts breached their agreement with the Trust by refusing to pay certain amounts to the Trust upon their withdrawal from the Trust. (Answer, New Matter, and Counterclaim, R.R. 145a–321a.)

In its final analysis, the trial court ruled in the School Districts' favor on the key issue in this case, that being the School Districts' entitlement as a matter of law to

---

1. The Court originally issued an opinion disposing of this matter on January 30, 2013. By Order dated March 28, 2013, we granted the Trust's Application for Reconsideration and withdrew that opinion.

disgorgement of millions of dollars from the Trust to fund separate trust accounts for the benefit of the School Districts' employees. On appeal, the Trust challenges this decision. It also challenges the trial court's decision to award the School Districts' their attorneys' fees. The School Districts, in their cross-appeal, contend that the trial court erred in failing to also require the Trust to reimburse the School Districts for the cost they incurred to have their own accounting performed.

For the reasons set forth below, we hold that the trial court erred as a matter of law in granting the School Districts the principal relief sought and will reverse the trial court on that basis and remand this matter to the trial court for further proceedings relating to the Trust's counterclaims. As a result, we need not address the other issues on appeal.

## BACKGROUND

### A. The Trust

In or around the summer of 1999, various school districts and the labor organizations representing the employees of those school districts executed an Agreement and Declaration of Trust Establishing the Northeast Pennsylvania School Districts (Health) Trust (Trust Agreement). The recitals to the Trust Agreement provide that the school districts and the labor unions determined that entering into a multiple employer trust arrangement "present[ed] the most cost effective method" to pay for the health and welfare benefits of the school districts' employees as negotiated through collective bargaining. (R.R. 1533a.) The recitals also provide that the school districts and labor unions determined that creation of the trust fund "present[ed] the most financially prudent method to preserve, maintain and to improve the existing scope, level and quality of medical, hospital and other health care and related benefits enjoyed by the employees." (*Id.* 1534a–35a).

In its request for tax exemption filed with the Internal Revenue Service (IRS), the Trust identified itself as follows:

The organization is a Trust created *to pool the resources* of 13 School Districts to provide health insurance coverage at reduced rates to the employees of those districts *by leveraging their buying power as a very large purchaser of benefits.* The agreement was made between the public school entities and their related labor organizations which are the certified and exclusive bargaining representatives of the employees.

*Each of the 13 participating public school entities and 13 labor organizations is represented by 1 of the 26 total trustees.*

*The trustees serve as the administrators of the Trust and are responsible for the control, disposition and management of the funds.*

The providing of health insurance benefits represents 100% of the Organizations (sic) activities, and all parties to the agreement are tax exempt entities. The activities were initiated approximately September 9, 1999 and are conducted in Luzerne County, Pennsylvania.

(R.R. 3040a (emphasis added).)[2]

There are several provisions in the Trust Agreement that guide our review of this matter. Section 1.1(a) of the Trust Agreement names the Trust and describes its purpose:

This Trust shall be entitled the Northeast Pennsylvania School Districts (Health) Trust Agreement (hereinafter

---

**2.** The IRS granted the Trust's request for tax-exempt status. (R.R. 3212a–14a.)

referred to as the "Trust"), and shall carry into effect the provisions of the Plan established and maintained by the Trustees *for the purpose of providing for its Participants or their Beneficiaries*, through the purchase of insurance or otherwise, medical, surgical or hospital care or benefits, or benefits in the event of sickness, accident, disability or death. All of the definitions in such Plan are hereby incorporated herein by reference. The Trustees hereby agree to act as Trustees of the Trust, and to take, hold, invest, administer and distribute the Trust Fund in accordance with the following provisions, including any and all contributions and assets paid or delivered to the Trustees pursuant to the Plan.

(*Id.* 1537a.) Section 1.1(b) provides the following:

All of the assets at any time held hereunder by the Trustees are hereinafter referred to collectively as the "Trust Fund". All right, title and interest in and to the assets of the Trust Fund shall be at all times vested exclusively in the Trustees.

(*Id.*) Section 1.1(c) provides:

The Trustees shall receive, take and hold any contributions paid to the Trustees in cash or other property acceptable to the Trustees. *All contributions so received together with the income therefrom and any other increment thereon shall be held, managed and administered by the Trustees pursuant to the terms of this Agreement without distinction between principal and income* and without liability for the payment of interest thereon.

(*Id.* 1538a (emphasis added).) Section 1.1(d) of the Trust is careful to note that the Trust Agreement should not be interpreted as conferring a vested right in beneficiaries or participants to a particular level or type of benefit. Rather, the section reinforces that such matters will be defined through the collective bargaining process.

Section 2.1 of the Trust Agreement authorizes the Trustees to retain the services of a third-party administrator (TPA). Nonetheless, it reserves in the Trustees certain powers and responsibilities:

(a) . . . The Trustees are hereby declared to be the .persons actually responsible for the control, disposition or management of the money received and contributed irrespective of whether such control, disposition or management is exercised directly or through an agent or Trustee designated by such person or persons. . . .

. . . .

(c) The Trustees shall have sole responsibility for determining the existence, non-existence, nature and amount of the rights and interests of all parties in the Trust Fund.

(*Id.* 1539a.)

The Trust Fund was to be funded by contributions from the school district members. Section 3.1 of the Trust Agreement provides in relevant part:

[A]ll contributions so received together with the interest therefrom and any increment thereon shall be held, managed and administered by the Trustees pursuant to this Agreement without distinction between principal and income. The Trustees shall have no personal liability other than . . . to require any contributions to be made to the Trustees by any public school entity, to determine that the amounts received comply with the Plan, or to determine that the Trust Fund is adequate to provide the benefits payable pursuant to the Plan. The Trustees shall adopt such guidelines and procedures as are required by state trust

and fiduciary law and, where and if applicable, by ERISA, with respect to collection of contributions, verification of contributions and adequacy of contributions.

(*Id.* 1540a.)

Additional powers and responsibilities of the Trustees are set forth in Article IV of the Trust Agreement. Among them is the duty to maintain records of receipts and disbursements and to report annually to the school district members each Plan year. The Trustees may act by simple majority vote on most matters. A change of the terms of the Trust Agreement requires a super-majority (two-thirds) vote. (*Id.* 1542a.) Section 4.4(j) also provides the Trustees with the authority to provide benefits to participants and beneficiaries (*i.e.*, the school districts' employees) on a fully-insured basis, through the purchase of insurance policies, or on a self-insured basis with amounts held in the Trust Fund, or a combination. (*Id.* 1546a.)

The Trustees elected to provide benefits on a self-funded basis. With respect to contributions for a self-funded plan, Sections 4.4(s) and (u) of the Trust Agreement confer on the Trustees the following powers:

> (s) to require that the public school entities who are or become a party to this Agreement . . . adequately fund the payment of all benefits provided under the Plan and to require annual, semi-annual or quarterly actuarially sound analyses and cost estimates, with the minimum requirement for such actuarial analysis and cost estimate being furnished on a semi-annual basis, for any plan of self-insurance undertaken by the Trustees so as to insure the solvency and liquidity of the Trust Fund at all time . . . ;
>
> . . . .

> (u) to require the public school entities who are or become party to this Agreement . . . to pay on a monthly, quarterly or annual basis to the Trust Fund an amount of money equal to what is determined by the Trustees *to be the allocable, pro-rata share of the total cost of the Trust Fund's total claims payable under its Plan of Benefits to be paid by that public school entity to the Trust Fund for the benefits to be afforded to all eligible employees under the Plan.*

(*Id.* 1549a (emphasis added).)

Section 4.7 of the Trust Agreement requires the Trustees to provide an annual report for each Plan year, setting forth (a) the net income (loss) of the Trust Fund; (b) gains (losses) realized upon sale or disposition of Trust Fund assets; (c) increase/decrease in the value of the Trust Fund; and (d) all payments and distributions from the Trust Fund. (*Id.* 1550a–51a.) We note that this section, as with many of the other sections of the Trust Agreement that relate to reporting, does not require the Trustees to provide a report of individual accounts or segregated funds of the member school districts. To the contrary, the Trust Agreement refers only to a single, unified fund—the Trust Fund.

Section 5.1 of the Trust Agreement authorizes the Trustees to amend the Trust Agreement, with one caveat:

> No amendment to this Agreement shall be effective if it authorizes or permits any part of the Trust Fund (other than such part as is required to pay taxes and administrative expenses) to be used for or diverted to any purpose *other than for the exclusive benefit of the Participants and/or their Beneficiaries or estates;* nor shall any amendment be effective if such amendment authorizes or permits or causes any portion of the

Trust Fund to revert to or become property of any public school entity.

(*Id.* 1554a (emphasis added).)

Section 5.2 of the Trust Agreement provides that the Trust will terminate upon complete distribution of all amounts in the Trust Fund "held for the benefit of Participants pursuant to the Plan. Such distribution will be at the time and manner determined by the Third Party Administrator and the Trustees pursuant to the requirements of the Plan with written instructions from the Trustees." (*Id.* 1555a.)

Section 5.4 of the Trust Agreement is titled "Withdrawal of Public School Entity or Labor Organization From Participation in the Trust." (*Id.* 1555a–57a.) For purposes of this matter, paragraph (a) of that section is relevant and provides:

Any public school entity party to this Agreement . . . may withdraw from the Trust Fund provided:

(1) on or before June 30, (the "Notice date"), it provides written notice to the Trustees of its intention to withdraw from the Trust Fund, which withdrawal shall become effective no earlier than twelve (12) months after the aforesaid June 30 "Notice date";

(2) within thirty (30) days after the effective date of withdrawal, the withdrawing public school entity pays to the Trust Fund all required contributions for claims incurred on behalf of Participants and Beneficiaries in the Trust Fund who are the employees of the withdrawing public school entity or dependent or Beneficiaries of those employees, which though incurred prior to the public school entity's withdrawal from the Trust Fund, have not been or will not be charged for, billed or paid until after the public school entity's effective date of withdrawal;

(3) the withdrawing public school entity takes such actions as are necessary to prevent a termination or lapse of coverage for the Participants in the Trust Fund who are employees of the withdrawing public school entity and their Beneficiaries and dependents whose coverage under the Plan will be terminated as a result of the public school entity's withdrawal from the Trust Fund, including the provisions for securing of a waiver or avoidance of any exclusions from post-withdrawal coverage based a[sic] claim of pre-existing illness or injury . . . .

(Emphasis added.) Stated otherwise, the withdrawing school district must provide proper written notice to the Trustees of its intent to withdraw. It must pay into the Trust Fund contributions for incurred claims that will not be paid or billed until after the effective date of the school district's withdrawal. Finally, the withdrawing school district must take steps to secure alternative coverage for its employees, who will no longer have coverage through the Trust upon the effective date of the withdrawal.

The Trust Agreement provides, and the parties do not advance a contrary position in this matter, that the Trust is a "governmental plan," exempt from the provisions of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 (ERISA). 29 U.S.C. § 1003(b)(1) (providing for exemption). Nonetheless, in Section 6.2 of the Trust Agreement, the Trustees incorporated certain provisions of ERISA as operating principles: (1) the fiduciary standards (*id.* §§ 1101–14); (2) "Continuation Coverage and Additional Standards for Group Health Plans" (*id.* §§ 1161–69); and (3) "Group Health Plan Requirements" (*id.* §§ 1181–91c).

Section 6.6 of the Trust Agreement, titled "Revocability of Trust," provides:

*All contributions made by public school entities to the Trust Fund shall be irrevocable,* and no part of the corpus of the Trust Fund nor any income therefrom shall revert to any public school entity or be used for or diverted to purposes *other than for the exclusive benefit of the Participants and their Beneficiaries,* except as provided by law, or as provided in the Plan or this Agreement and Declaration of Trust.

(R.R. 1561a (emphasis added).)

On December 18, 2002, the Trustees approved a plan to address deficits and surpluses that may arise over the life of the Trust. This resolution, dubbed the "Scoda Resolution," [3] provided the following with respect to future deficit and surplus balances in the Trust Fund:

Deficit allocations determined in accordance with the provisions below represent a binding financial obligation of each employer member (Member) individually to make payment for their [sic] share of the deficits upon either termination of the Trust, withdrawal from the Trust, or the decision by the Trust to directly fund a deficit through special assessment.

. . . .

4. Deficits incurred in any future year shall be shared proportionally by all members using the percentage produced by dividing each member's full year contributions by the full year contributions for all members.

5. In a fiscal year where the Trust realizes a surplus, the surplus shall first be applied against the oldest outstanding deficit.

. . . .

6. In the event that the Trust realizes Unrestricted Net Assets—Surplus,

said surplus shall, at the discretion of the Trust, be used for any of the purposes listed below:

(1) Reserved to fund future unanticipated deficits.

(2) Stabilize future member contributions.

(3) Added to required reserve deposits either held by underwriting/carriers or in an escrow investment account held by the Trust solely for this purpose.

(4) Any combination of the above.

(*Id.* 1775a–76a.)

## B. The Dispute

The School Districts were voluntary participants in the Trust from its inception until their voluntary withdrawal effective July 1, 2007.[4] They commenced their action against the Trust on February 4, 2008. In their Amended Complaint, the School Districts contended that upon their withdrawal, they were entitled to a share of what they contended was approximately $18.3 million of surplus funds that existed in the Trust as of their withdrawal date under breach of contract, unjust enrichment, and breach of fiduciary duty theories. The School Districts sought disgorgement of approximately $5.2 million, or 28.4% of the total surplus amount as of June 30, 2007, to fund new trust accounts for the benefit of their employees post-withdrawal. They allege that this portion of the surplus funds represents, is attributable to, or is traceable to the contributions that the School Districts made to the Trust Fund over the years.

The first several years of the Trust's operations produced annual deficits. By June 30, 2002, the accumulated deficit in

---

**3.** Scoda is a reference to the proponent of the plan, Ralph Scoda.

**4.** The Trust operated under a July 1 to June 30 fiscal year.

the Trust Fund had reached approximately $4.3 million. Deficit reduction efforts and changes in the methodology for calculating member contributions, however, addressed the deficit balance. By the conclusion of the 2004–2005 plan year, the Trust Fund had a surplus balance of $1.38 million. A greater surplus was anticipated for the plan year ending June 2006. Accordingly, the Trustees authorized the use of a portion of the accumulated surplus to reduce member contribution rates during the 2005–2006 plan year.

Notwithstanding the Trustees' decision to allocate a portion of the existing and anticipated surplus to reduce contribution rates, as of June 30, 2006, the surplus had grown to approximately $6.9 million. Days earlier, the School Districts submitted separate notices of withdrawal to the Trust, effective June 30, 2007. Notwithstanding the accumulated surplus, the Trustees adopted a budget on November 20, 2006, for plan year 2007–2008 that made no provision for using the surplus to reduce member contributions to the Trust Fund.

Before the effective date of withdrawal, the trustee representing the Pittston Area School District made a motion to authorize a credit to all trust members as of June 30, 2007. As of that date, the Trust Fund surplus was approximately $11.4 million. By a majority vote of the Trustees during an April 18, 2007 Board of Trustees meeting, the motion was tabled and referred to the Accounting Committee for review. (Trial Ex. P–195, R.R.1983a–87a.) At the Trustees' July 18, 2007 meeting (18 days after the effective date of the School Districts' withdrawal from the Trust), the Trustees approved a "one month forgiveness" of contributions by member school districts totaling approximately $3.3 million. (Trial Ex. P–225, R.R. 2153a–53b; Trial Ex. 228, R.R. 2161a.)

The School Districts chose to withdraw from the Trust because of the growth of the surplus and their dissatisfaction over the Trustees' decisions not to use the ballooning surplus to reduce member contributions to the Trust Fund. Accordingly, they determined that it was no longer advantageous for them, their taxpayers, or their employees to participate in the Trust. (Trial Ct. Opinion at 4.) Prior to and subsequent to the effective date of their withdrawal, School Districts made demands on the Trust to account for the amount of surplus accumulated in the Trust Fund that was attributable to the School Districts from inception of the Trust to their withdrawal. They also demanded the Trust remit whatever that amount was to a constructive trust for the benefit of the withdrawing School Districts' employees. The Trust refused both demands, leading to this litigation.

### C. Trial Court Proceedings

This matter proceeded to a bench trial on the School Districts' breach of contract (i.e., the Trust Agreement), unjust enrichment, and breach of fiduciary duty claims against the Trust. In the breach of contract counts (Counts III and IV), the School Districts alleged that the Trust violated the "exclusive benefits rule," as set forth in the Trust Agreement, by refusing to disgorge the portion of the Trust Fund surplus that the School Districts claim is attributable to their participation in the Trust. (R.R. 28a–29a (Amend.Compl.).) In the unjust enrichment counts (Counts VI and VII), as an alternative to their breach of contract theory, the School Districts argued that by retaining the surplus funds to which they claim they are entitled, the Trust is being unjustly enriched, as those funds will be used to benefit the employees of other school district members. (Id. 30a–32a.) The School Districts also alleged, without further elaboration,

that the aforesaid conduct amounted to an actionable breach of fiduciary duty (Counts IX and X) by the Trustees. As remedies, the School Districts sought imposition of a constructive trust on a portion of the Trust Fund's surplus as of July 1, 2007, damages in the form of the costs the School Districts incurred for actuarial services when the Trust refused the School Districts' request for an accounting of the surplus funds, interest on the fund subject to the constructive trust, and attorneys' fees. (R.R. 478a–83a (Pls.' Proposed Findings of Fact and Conclusions of Law).)

Following a bench trial, the trial court issued its Opinion and Order in this matter on November 28, 2011. Therein the trial court framed the issues before it as follows:

> 1. Is the "Health Trust" a pooled trust whereby the funds paid into it by its members are to be pooled together for the benefit of all of the members of the trust?
>
> 2. If the "Health Trust" is not a pooled trust are the Plaintiffs entitled to recover their respective portion of any trust surplus which existed at the time of their withdrawal from the Health Trust?
>
> 3. If the Plaintiffs are entitled to a portion of the surplus, how should that distribution be made to the Plaintiffs?

(Trial Ct. Op. at 5–6.) The trial court proceeded to analyze these questions, without any direct reference to the causes of action asserted by the School Districts.[5] The trial court's analysis of these questions (*id.* at 6–12), however, was driven predominately by its review and interpretation of the Trust Agreement. Accordingly, we interpret the trial court's decision below as resting on the School Districts' breach of contract claims (Counts III and IV) only.

The trial court looked at various provisions of the Trust Agreement, including the recitals, Section 6.6 (relating to irrevocability of contributions), and Section 6.2 (incorporating fiduciary standards of ERISA as operating principles). The trial court noted that notwithstanding a school district's participation in the Trust, the actual healthcare benefits that a school district provides to its employees are a matter of collective bargaining. Thus, though all school districts are members of the Trust, benefit plans may vary among the members depending on what each negotiated with its employees. The trial court further noted that contribution amounts vary among participants in the Trust and are based, in part, on the benefits, number of employees, and claims experience of each school. This is how the Trust arrives at each participating school district's *pro-rata* share for purposes of determining contributions due under Section 4.4(u) of the Trust Agreement.

Looking at the language in Section 6.6, and the recitals noting each school district's obligations to its own employees, the trial court concluded that Section 6.6 and the "sole and exclusive benefit" language therein must be read as a reference to each participating school district's share of the Trust Fund corpus and a corresponding duty/desire on the part of each school district to ensure that such part of that corpus be used for the sole and exclusive benefit of each school district's employees. The trial court further noted the absence of any specific provision in the Trust referencing a "pooling" of each school district's separate contributions to the Trust Fund

---

**5.** Neither the trial court's Opinion and Order nor the final judgment of record references any of the counts in the Amended Complaint.

for the benefit of all of the participating school districts' employees.

The trial court also found material the fact that the Trust monitored the amounts each school district contributed to the Trust Fund and each school district's claim experience. It noted that the Trust, in the past, required a withdrawing school district (Crestwood School District) to pay its share of any deficits in the Fund upon withdrawal. All of these factors led the trial court to conclude that "it is inconsistent to construe the Health Trust as a pooled trust agreement whereby all funds contributed by the members benefit all of the members." (Trial Ct. Opinion at 9.) [6]

After concluding that the Trust was not a "pooled trust," the trial court noted that under ERISA and Section 6.6, the Trust assets were to be used for the exclusive benefit of participants and their beneficiaries, or what the parties refer to as "the exclusive benefit rule" of ERISA.[7] The trial court held that this language "permits" the distribution of surplus funds from the Trust Fund upon the withdrawal of a school district member so long as the funds are used solely for the exclusive benefit of the withdrawing member's employees. The trial court then concluded that the School Districts were "entitled" to a *pro rata* distribution of the surplus in the Trust Fund as of June 30, 2007. Relying again on ERISA, the trial court held that these funds would be placed in separate constructive trust funds for the benefit of the School Districts' employees.

In addition to relying on ERISA's exclusive benefit rule and provisions in the Trust Agreement using similar "exclusive benefit" language, the trial court relied on a decision by the United States District Court for the Eastern District of New York. In *L.I. Head Start Child Development Services, Inc. v. Kearse*, 86 F.Supp.2d 143 (E.D.N.Y.), *reconsideration granted in part*, 96 F.Supp.2d 209 (E.D.N.Y.2000), L.I. Head Start Child Development Services, Inc. (Head Start) decided to withdraw from an ERISA multiple employer benefit trust. In so doing, it demanded that the trust release assets it held attributable to Head Start employees pursuant to the exclusive benefit rule in ERISA. The district court held that the trust fund in question was not a pooled fund:

---

6. The Trust points out that the trial court also held that to construe the Trust Agreement in this case as a "pooled trust" would violate public policy. We note that the trial court does not cite any legal basis for this conclusion, and it does not appear that the School Districts advanced a public policy argument before the trial court. Suffice it to say that all parties agree that multiple employer benefit plans, whereby employers pool their resources for the benefit of all participants, are not *per se* illegal or void for public policy. We, therefore, need not further address the trial court's brief foray into public policy, as we do not find it material to the issues now before the Court.

7. The "exclusive benefit rule" has been interpreted to reference (at least) two sections of ERISA. Section 403(c)(1) of ERISA provides the general rule that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). Section 404(a)(1)(A)(i) of ERISA provides that fiduciaries of a plan, in this case the Trustees, "shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries [and] defraying reasonable expenses of administering the plan." *Id.* § 1104(a)(1)(A)(i); *see* Daniel R. Fischel & John H. Langbein, *ERISA's Fundamental Contradiction: The Exclusive Benefit Rule*, 55 U. CHI. L.REV. 1105 (1988).

Based on the documentary evidence and the testimony adduced at trial, the Court finds that [the trust] *segregated contributions* of each of the participating employers and *directly allocated the benefits paid* and the proportionate ... administrative expenses to each of the contributing employers.

*L.I. Head Start*, 86 F.Supp.2d at 147 (emphasis added). Applying the exclusive benefit rule in ERISA to the segregated funds of Head Start, the district court held that those segregated funds had to be returned to Head Start upon its withdrawal from the multiple employer benefit trust. *Id.* at 150–54.

Following issuance of the trial court's Opinion and Order in the case now before the Court, the Trust and the School Districts filed post-trial motions, which the trial court denied on December 27, 2011.

### D. Appeal/Cross–Appeal

As noted above, the Trust filed a timely appeal from the trial court's decision, which invited a timely cross-appeal by the School Districts.[8] The first and main issue that the Trust raises on appeal is whether the trial court erred as a matter of law in concluding that the Trust was segregated by employer and, therefore, that withdrawing employers were entitled as a matter of law to a distribution from the Trust assets upon withdrawal. Both parties rely on the language of the Agreement to support their respective positions on this question. The School Districts defend the trial court's reliance on the district court's

decision in *L.I. Head Start*, while the Trust contends that the case is distinguishable and not controlling. Moreover, the parties offer divergent views on the Trust's course of conduct and how it impacts the disposition of this matter. Finally, the School Districts argue that in the event we conclude that the trial court erred, we should nonetheless uphold the verdict in their favor on an unjust enrichment theory.[9]

### DISCUSSION

Based on our review of the record, particularly the School Districts' pleadings, it is clear to this Court that the School Districts became dissatisfied with the manner by which the Trustees administered the Trust. Specifically, the School Districts took issue with (a) how the Trustees chose to calculate the mandatory contributions of each member school district and (b) how the Trustees chose to use/allocate surplus funds that grew in the Trust Fund over time. Though the School Districts and their employees' unions were represented on the Board of Trustees of the Trust, their views on these two matters apparently represented the minority view and thus did not carry the day. As a result, the School Districts chose to withdraw from the Trust.

Based on the language set forth in the Trust Agreement and the Trust's application to the IRS for tax exempt status, the Trust settlors, including the School Districts, vested in the Board of Trustees

---

**8.** Our review in this matter is limited to determining whether the trial court's findings of fact are supported by competent evidence and whether the trial court committed an error of law. *M & D Props., Inc. v. Borough of Port Vue*, 893 A.2d 858, 861 n. 4 (Pa.Cmwlth.), *appeal denied*, 588 Pa. 790, 906 A.2d 1197 (2006). Moreover, the trial court's findings "must be given the same weight and effect on

appeal as a verdict of a jury and will not be disturbed absent an error of law or abuse of discretion." *Id.*

**9.** We note that *amici curiae* have filed briefs in this matter. All expressed concern over the portion of the trial court's public policy analysis, which we address in footnote 5 of this opinion.

broad authority over the management of the affairs of the Trust, including, *inter alia,* determining the amounts that member school districts would contribute to the Trust Fund and how any assets of the Trust Fund would be used or distributed. (Trust Agmt. §§ 2.1, 3.1, 4.4.) Discretionary decisions of the Board of Trustees on such matters, however, are not unassailable. They may still be reviewed by a court of appropriate jurisdiction to determine whether the Board of Trustees abused its discretion. *See Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 111, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

But in commencing this lawsuit, the School Districts did not challenge as an abuse of discretion or breach of fiduciary duty the Board of Trustees' chosen methodology for establishing contributions, which the School Districts claim led to excessive contributions, or the Board of Trustees' refusal to use accumulated surplus funds to reduce member contributions to a greater extent than it did. They also did not challenge the Scoda Resolution, which memorialized the Board of Trustees' decision on how surplus funds in the Trust Fund at the end of each plan year may be used, at the discretion of the Trustees.

Rather than lodge these or similar challenges while members of the Trust, the School Districts chose to withdraw from the Trust and to demand that a portion of the accumulated surplus in the Trust Fund as of June 30, 2007, be placed into constructive trusts so each withdrawing school district could establish a new single employer health plan for its employees. The School Districts' claim to a share of the Trust Fund surplus hinges on the contention that the Trust was not a multiple employer trust, but rather an aggregate of segregated single employer plans. If so, the School Districts contend that under the "exclusive benefit rule," as incorporat-

ed into the Trust Agreement and as interpreted by the district court in *L.I. Head Start,* the Trustees *must* disgorge the demanded portion of the Trust Fund surplus.

■ The trial court accepted the School Districts' foundational premise that the Trust was an aggregate of segregated single employer welfare plans and not a multiple employer pooled plan. We do not. Interpretation of the Trust Agreement is a matter of law and is, therefore, subject to our *de novo* review. *Wimer v. Pa. Emps. Benefit Trust Fund,* 595 Pa. 627, 639–40, 939 A.2d 843, 850 (2007); *Scalfaro v. Rudloff,* 594 Pa. 210, 215 n. 2, 934 A.2d 1254, 1257 n. 2 (2007). We are guided by the following:

> A settlor's intent is to be determined from all the language within the four corners of the trust instrument, the scheme of distribution and the circumstances surrounding the execution of the instrument. Only if a settlor's intent cannot be ascertained with reasonable certainty will a court apply canons of construction, to attribute a reasonable intention to the settlor in the circumstances.

*Farmers Trust Co. v. Bashore,* 498 Pa. 146, 150, 445 A.2d 492, 494 (1982).

Based on our review of the language in the Trust Agreement, we conclude that the intent of the settlors of the Trust was to create a single Trust Fund for the benefit of all participants and beneficiaries. This intent is evident throughout the Trust Agreement. We note particularly that Section 1.1(b) of the Trust Agreement provides that *all* assets of the Trust are to be held in a single "Trust Fund," not in separate funds or accounts attributable to each employer. (R.R. 1537a.) In terms of funding, Section 4.4(u) of the Trust Agreement clearly provides that each member's contribution to the Fund shall be based on the benefits afforded "to all eligible em-

ployees under the Plan," not on only the benefits paid to each member's employees. (*Id.* 1549a.)

In terms of the annual reporting provision in Section 4.7 and other reporting provisions in the Trust Agreement, Trustees are required to report the activities of the single Trust Fund only. There are no references to any other funds, let alone segregated funds for each member school district. All references to participants and beneficiaries throughout the Trust Agreement are to participants and beneficiaries under a single Plan created under the banner of the Trust, not to subsets of participants and beneficiaries of separate plans for each member school district.

The absence of any segregated funds and separate reporting for each member school district distinguish the Trust in this case from the multiple employer welfare arrangement in *L.I. Head Start*, on which the trial court and School Districts rely so heavily. The district court specifically noted the existence of separate funds and separate reporting as its basis for concluding the trust arrangement in *L.I. Head Start* was not a "pooled" trust:

> Based on the documentary evidence and the testimony adduced at trial, the Court finds that [the trust] *segregated contributions* of each of the participating employers and *directly allocated the benefits paid* and the proportionate . . . administrative expenses to each of the contributing employers.

*L.I. Head Start*, 86 F.Supp.2d at 147 (emphasis added). If there was any lingering question about the basis for that decision,

the district court clarified when it denied reconsideration: "In the decision in the first action, the Court determined that [the trust] *segregated the contributions of each of the participating employers.*" *L.I. Head Start Child Dev. Servs., Inc. v. Economic Opportunity Comm'n of Nassau Cty., Inc.*, 558 F.Supp.2d 378, 383 (E.D.N.Y.2008) (emphasis added).

Here, by contrast, there is no finding by the trial court, and no evidence to support a finding in this case, that the Trust "segregated" employer contributions. To the contrary, as noted above, the Trust Agreement requires all assets to be included in a single fund.[10] There is also no finding that the benefits paid to each member school district's employees were chargeable only against the contributions of the employing school district. Rather, the Trust Agreement provides that distributions will be made out of the Trust Fund and that employer contributions will be based on benefits paid to all employees out of the Trust Fund. Even School Districts acknowledge, as they must, that "all contributions are paid into one account, and all expenses are paid from that one account." (Br. of Appellees/Cross–Appellants at 20.) Such is a trait of a pooled trust, not a segregated trust.

We also take notice of the circumstances surrounding the creation of the Trust. At the time, the settlors were faced with rising premiums under their separately-maintained health insurance plans. As the recitals to the Trust Agreement reflect, entering into the multiple employer trust

---

**10.** In its opinion in *L.I. Head Start*, the district court relied on testimony from the trust's accountant. The accountant testified that the Schedule of Reserves contained in the trust's annual financial reports indicated that each employer's contributions were segregated. *L.I. Head Start*, 86 F.Supp.2d at 147. The audited annual financial records for the Trust are included in the Reproduced Record for plan years ending 2000 to 2007. (R.R. 3593a–705a.) Here, those financial statements, in contrast to the financial statements of the trust in *L.I. Head Start*, do not indicate a segregation of each employer's contributions, expenses, and/or net underwriting profit (loss).

arrangement was seen as a mechanism to save costs while creating the possibility of improving the scope, level, and quality of benefits for *all* employees. The Trust described how this would be done when it applied to the IRS for its tax-exempt status:

> The organization is a Trust created *to pool the resources* of 13 School Districts to provide health insurance coverage at reduced rates to the employees of those districts *by leveraging their buying power as a very large purchaser of benefits.*

(R.R. 3040a (emphasis added).) Clearly, the intent of the settlors, as represented to the IRS, was to "pool" their resources to secure better benefits for all employees, not simply to come together to share common administrative costs while maintaining separate, segregated self-funded health plans.

Our interpretation is not at all affected by the trial court's factual findings, which we accept as true for purposes of our analysis. Both the trial court and the School Districts focused exhaustively on the Trust's recordkeeping of each member school district's contributions to the Trust Fund and claims experience. The School Districts emphasize how each member school district negotiated its own plan of benefits for its employees, thus necessitating the tracking of actual claims experience of each member school district.

Whether the Trust was able to or even did maintain records of each member school district's contributions and claims experience does not prove the existence of separate, segregated funds for each employer. Maintaining premium and loss history records is part and parcel of the business of insurance. Such records are used by insurance companies to determine, *inter alia*, underwriting profit (loss) and thus whether any premium adjustment is appropriate. Similar to premium rates paid to an insurance company, the contributions of the member school districts of the Trust Fund were based, in part, on each school district's claims experience. It is, therefore, expected that the Trust would maintain financial records of each member school district's experience (*i.e.*, claims and contributions).

The maintenance of such records and the ability to use these records to attribute proportionately to member school districts accumulated surplus in the Trust Fund at the end of a Plan year based on each school district's underwriting profit/loss for a particular year or even since the inception of the Trust, however, are not material to the question of whether the settlors intended (a) to create a single, pooled fund into which all contributions are to be made and from which all benefits are to be paid, or (b) to create a trust made up of separate, segregated funds for each member school district, from which only the benefits paid to that member school district's employees would be paid and to which the member school district's share of administrative expenses would be charged. Based on our review of the Trust Agreement, it is clear that the settlors intended (a) and not (b).[11]

Both the trial court and the School Districts find it unfair that under Section

11. We also do not find material the trial court's focus on the withdrawal of Crestwood School District from the Trust after the Trust's first year of operation. At that time, the Trust Fund was operating at a deficit. Crestwood School District withdrew, and the Trust demanded that it account for its share of the deficit after the first year of operation. Such a demand does not, in our view, compel the conclusion that the Trust maintained segregated funds or accounts for each member school district. Rather, the demand appears to have been a prudent effort to avoid allowing a member school district, after a single year of operation, to cut and run and leave the remaining members of the Trust to address the deficit. Similarly, the requirement in Section 5.4(a)(2) of the Trust Agreement

5.4(a)(2) and the Scoda Resolution, withdrawing school districts may have to pay money into the Trust Fund, but may not receive a share of any surplus existing in the Fund upon withdrawal. Fair or not, however, that is how both the Trust Agreement and the Scoda Resolution are written. By electing to join the Trust, the School Districts agreed to be bound by the terms of the Trust Agreement, including terms that granted broad authority to the Trustees. There are no provisions in the Trust Agreement or in the Scoda Resolution that entitle a withdrawing school district to a transfer of Trust assets to fund a new single employer plan for its employees. Under these circumstances, we are guided by our Supreme Court's admonishment:

> Courts cannot, even when aided by hindsight and the ingenuity of counsel, rewrite a settlors deed or a testator's will, or distort or torture his language or the language of a statute relating thereto, in order to attain what we believe is beneficial and wise, or even what we believe settlor would or should have provided if he had possessed a knowledge of all presently existing circumstances.

*In re Kelsey's Estate*, 393 Pa. 513, 519, 143 A.2d 42, 45 (1958).

Moreover, as noted above, rather than withdraw from the Trust, the School Districts, through their representatives on the Board of Trustees, could have continued to press for changes in the methodology for calculating member school district contributions and for the use of the accumulated surplus to reduce future contributions. They also could have attempted to challenge as an abuse of discretion the Board of Trustees' decisions with respect to both the setting of contributions and the use of surplus in the Trust Fund. Instead, the School Districts chose to withdraw and, based on the foregoing analysis, now lack any *right* to a stake in the Trust Fund surplus on behalf of their employees.[12]

Because we conclude that the Trust is not made up of separately segregated accounts, or funds, for each member school district, the School Districts cannot prevail on their claim that the "exclusive benefit rule," as either expressly set forth in Section 6.6 of the Trust Agreement or as incorporated from ERISA by Section 6.1 of the Trust Agreement, requires the Trust Fund to carve out a portion of the surplus in the Trust Fund as of June 30, 2007, for the exclusive benefit of the withdrawing School Districts' employees. The trial court, therefore, erred in concluding that the School Districts were "entitled" to these funds on this theory.[13] Accordingly, we will reverse the trial court's judgment in favor of the School Districts.

Finally, the Trust, at pages 40 and 41 of its principal brief, asks that we remand

---

that withdrawing school districts pay for run-off claims protects the remaining school districts from increased contribution demands in the year(s) following withdrawal attributable to those run-off claims. Again, though this provision evidences tracking of member-specific claims experience, it does not prove the existence of segregated funds within the Trust for each member school district (as opposed to a single, pooled fund).

**12.** As the School Districts point out, the Trustees, 18 days after the effective date of School Districts' withdrawal from the Trust, approved a "one month forgiveness" of contri-

butions by all member school districts, totaling approximately $3.3 million. (Trial Ex. P–225, R.R. 2153a–53b; Trial Ex. 228, R.R. 2161a.) Though the School Districts may be skeptical about the timing of this decision, there is no question that if the School Districts had not withdrawn from the Trust, they too would have benefitted from the Trustees' decision to grant contribution relief to all members of the Trust.

**13.** In light of our disposition, we will not address most of the parties' remaining arguments and issues, with the following exceptions. The School Districts ask us to affirm

this matter to the trial court for entry of a judgment in the Trust's favor and against the School Districts on the Trust's counterclaims for payment of "runoff" liability pursuant to Section 5.4 of the Trust Agreement. Because it is not clear to us from the record how, if at all, the trial court disposed of the Trust's counterclaims, we will not rule on the merits of the counterclaims. Instead, we will remand this matter to the trial court with instruction that the trial court enter a final judgment on the Trust's counterclaims relating to "runoff" liability, as the trial court deems appropriate.

### ORDER

AND NOW, this 17th day of April, 2013, the judgment of the Court of Common Pleas of Luzerne County is REVERSED and this matter is REMANDED to the trial court with instruction that the trial court enter a final judgment on the counterclaims of Northeast Pennsylvania School Districts (Health) Trust.

Jurisdiction relinquished.

the trial court on the alternative theory of unjust enrichment. The School Districts, however, cannot prevail on an unjust enrichment claim where their rights and obligations are established under written agreement—*i.e.*, the Trust Agreement. "[T]hat principle of quasicontract is not applicable to agreements deliberately entered into by the parties however harsh the provisions of such contracts may seem in the light of subsequent happenings." *Third Nat'l Bank & Trust Co. of Scranton v. Lehigh Valley Coal Co.*, 353 Pa. 185, 193, 44 A.2d 571, 574 (1945). The School Districts, in their cross-appeal, ask us to remand this matter to the trial court and order the trial court to enter a judgment in the School Districts' favor in the amount of $112,628.79, which represents the cost the

School Districts incurred in actuarial services to determine what they contend is their pro-rata share of the Trust Fund surplus as of June 30, 2007 (the withdrawal date). The School Districts contend that they were forced to incur this expense when the Trust refused to provide the accounting they requested both before and after their withdrawal. That accounting request, however, was directly related to the School Districts' contention that they are entitled to a share of the Trust Fund surplus upon withdrawal. Because we have concluded that they are not so entitled, we will not require the Trust to pay for an accounting that the School Districts commissioned to support an unsuccessful claim.